IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| TERESA R. WAGNER, | * | |
| | * | |
| Plaintiff, | * | 3:09-cv-10 |
| | * | |
| v. | * | |
| | * | |
| CAROLYN JONES, Dean of Iowa College of Law | * | |
| (in her individual capacity); GAIL B. AGRAWAL, | * | |
| Dean of the Iowa College of Law (in her official | * | |
| capacity), | * | |
| | * | ORDER |
| Defendants. | * | |
| | * | |
| | * | |

     Before the Court are the following motions:  1) Teresa Wagner's ("Plaintiff") Objection[1] to Entry of Judgment on Count I ("Pl.'s Objection") (Clerk's No. 126), filed October 25, 2012; 2) Carolyn Jones' and Gail Agrawal's ("Defendants") Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) ("Defs.' Mot. for JAML") (Clerk's No. 130), filed November 1, 2012; 3) Defendants' Motion to Strike Plaintiff's Reply to Resistance to Objection to Entry of Judgment on Count I or, in Alternative, Request that the Court Consider the Response Brief Filed by Defendants ("Defs.' Mot. to Strike") (Clerk's No. 131), filed November 9, 2012; 4) Plaintiff's Motion for New Trial ("Pl.'s Mot. for New Trial") (Clerk's No. 133), filed November 20, 2012; 5) Plaintiff's Motion to Alter Judgment or Alternatively Motion for Relief from Judgment, filed November 26, 2012 ("Pl.'s Mot. to Alter") (Clerk's No. 135); and 6) Defendants' Motion for Leave to File Additional Authority in Support of Defendants' Renewed

---

[1]    Although not filed as a "motion," the Court will treat Plaintiff's "Objection" as a motion for relief.

Motion for Judgment ("Defs.' Mot. for Leave") (Clerk's No. 138), filed December 10, 2012.

Defendants filed a resistance to Plaintiff's Objection on October 29, 2012.  Clerk's No. 129.

Plaintiff replied on October 31, 2012.[2]  Clerk's No. 130.  Plaintiff filed a resistance to

Defendants' Motion for JAML on November 19, 2012.  Clerk's No. 132.  Defendants replied on

November 28, 2012.  Clerk's No. 136.  Plaintiff filed a resistance to Defendants' Motion to

Strike on November 26, 2012.  Clerk's No. 134.  Defendants filed a resistance to Plaintiff's

Motion for New Trial on December 6, 2012.  Clerk's No. 137.  Defendants filed a resistance to

Plaintiff's Motion to Alter on December 12, 2012.  Clerk's No. 139.  Plaintiff filed a resistance

to Defendants' Motion for Leave on December 21, 2012.  Clerk's No. 140.  Defendants replied

on December 31, 2012.  Clerk's No. 141.  The matters are fully submitted.

## I.  FACTUAL BACKGROUND

On October 15, 2012, trial in this case commenced in Davenport, Iowa.  *See* Clerk's No.

102.  After several days of testimony, the jury began deliberations on two counts from Plaintiff's

Complaint at the end of the trial day on October 22, 2012.  Clerk's No. 110.  Specifically, the

jury was tasked with deciding Plaintiff's claims of:  1) political discrimination; and 2) equal

protection, both arising under 42 U.S.C. § 1983.[3]

The jury deliberated the entire day on October 23, 2012, with United States Magistrate

Judge Thomas Shields presiding over the deliberations with the consent of the parties.  On

October 24, 2012, the jury continued deliberations.  At around 9:00 in the morning, the jury sent

---

[2]     Plaintiff's Reply is the subject of Defendants' Motion to Strike.

[3]     Generally, Plaintiff claimed that she was denied a position as an LAWR instructor
with the University of Iowa because of her conservative viewpoints and activism.

a note asking, "What happens if we cannot come to an agreement?"  *See* Clerk's No. 121.  After

consulting with the attorneys and with the undersigned, Judge Shields advised the jury to

continue its deliberations in an attempt to arrive at a unanimous verdict.[4]

At approximately 11:00 a.m. on October 24, 2012, Judge Shields received another note

from the jury, signed by all twelve jurors, which stated:  "We are unable to come to a unanimous

verdict for either the Plaintiff, Teresa Wagner, nor Defendant, Carolyn Jones."  *See* Clerk's No.

122.  In a colloquy between the undersigned, Judge Shields, and counsel, the following occurred,

in pertinent part:

| The Court: | [S]o my first question is we don't know if this pertains to one of the submitted counts or both of the submitted counts, I am assuming, maybe this is an assumption I should not make, it pertains to both counts that the jury has, the discrimination claim and the equal protection claim, so if that is something I should put my trust in, that is that both counts they are unable to reach a unanimous verdict, I want to know the Plaintiff's sense, I think I know the answer to this based upon Mr. Fieweger's earlier e-mail, I suspect, Mr. Fieweger, is it fair to say you still want the Court to give an instruction, better known as the Allen charge, which is in the patter instructions is 3.07? |
|---|---|
| Mr. Fieweger: | I do. |
| The Court: | Mr. Carroll, what is the Defendant's position? |
| Mr. Carroll: | I disagree with giving that instruction, certainly at this point in time . . . . I honestly think they should be told, I mean number one, go back and deliberate; but if they're saying—if that's their note, that's fine; but if, you know, if Plaintiff is saying you must given the Allen, then I have a proposal instead of that . . . .  I also think that—and I understand what the Allen instruction is, it is so unbelievably coercive to jurors that the Court is saying people, go back, when they've tried so hard and I know the Allen |

---

[4]       *See* Oct. 24, 2012 Trial Tr. at 3 (Magistrate Judge Shields:  "Judge Pratt and I also agree that the appropriate instruction to the jury is simply you are directed to continue your deliberations in an attempt to arrive at a unanimous verdict.  I will not advise the jury that if they cannot reach an agreement, there will be a mistrial and/or a new trial.  I think that would be inappropriate at this stage.  That may come later, but that would be a decision for Judge Pratt to make so that will be the written instruction that I give to the jury and that will be filed along with th[is] question[].").

instructions has been approved, but I disagree that there should be any Allen instruction.

The Court:       Mr. Carroll, the circuit approved it in a case called *Williams v. Fermenta Animal Health Co.*, 924 Fed.2d 261, a 1993 case in which they said there's no error where the District Court gave the Allen charge to a civil jury in an employment discrimination case.

Mr. Carroll:     I must admit I wasn't aware of that decision, Your Honor, but I still am objecting.

The Court:       I don't disagree, Mr. Carroll.  You make a very good point and what my law clerk just told me we have done historically, that is I am talking about myself, is that I've always said go back and deliberate again, keep deliberating before I have given the Allen charge.  Here is the problem I think with that now.  The Magistrate Judge has already instructed them continue your deliberations, and Judge Shields, am I correct, that that is the status of your communications with the jury?

Judge Shields:  That is correct, Judge Pratt.  That is the last written Order that I gave them.

The Court:       And that—

Mr. Fieweger:   And that was back at like 9:30, wasn't it Judge?

Judge Shields:  That's correct.

Mr. Fieweger:   Okay.  they've been deliberating now for another two hours with no progress and a note that is signed by all 12 saying they can't agree on anything.

The Court:       I am reading the committee comments to 3.07 and, you know, my sense is to tell them one more time, continue your deliberations, and if we get another note, then give the Allen charge; but, you know, I want to hear from both of you.  Maybe that's too, quote, conservative, and on the other hand, maybe it is too, quote, explosive to give them the Allen charge now.  Mr. Fieweger, you are still firm that you want it?

Mr. Fieweger:   Right.  [cites and discusses additional case law].

The Court:       Okay.

Mr. Fieweger:   Mr. Carroll.

Mr. Carroll:     I don't have those cases in front of me nor have I done that research.  I continue to object to the Allen charge . . . .

. . .

The Court:       Okay.  Here is what the Court is going to do.  I am going to tell Judge Shields to tell them to continue to deliberate then after lunch I am going to give them the Allen charge . . . because I am going to have them eat lunch, Tom is going to tell them now—Judge Shields is going to say continue to deliberate, and then after lunch I am going to have Tom read—have Judge Shields read them the Allen Charge.

Oct. 24, 2012 Trial Tr. at 5–10.[5]

At approximately 1:11 p.m. on October 24, 2012, Judge Shields convened the jury in open court and read the jury the Allen charge. *See id.* at 11–13.  At around 3:24 p.m., Plaintiff's counsel, Mr. Fieweger, requested by email that a mistrial be declared. *See* Clerk's No. 126-2 at 4 ("It has become obvious to me as plaintiff's counsel that this jury cannot reach a unanimous verdict and [I] would request that they be discharged from their duties and that a new trial be held").  At approximately 4:00 p.m., the undersigned and counsel held a brief conference call wherein Defendants' counsel, George Carroll, stated that he needed to discuss the matter with his clients.[6] *See id.* at 3.  A short time later, the Court received another note from the jury, which stated:  "We are still unable to come to an [sic] unanimous verdict.  I DO NOT SEE US EVER AGREEING.  One juror has conflict and needs to leave at 4:30 today.  And another Juror, with the sick child, may not be able to attend on Thursday.  Please advise where we go from here."[7] Clerk's No. 124.

At approximately 4:30 p.m. on October 24, 2012, Judge Shields again convened the jury in open court.  *See* Clerk's No. 114 (Clerk's Court Minutes from October 24, 2012).  After reciting the contents of the jury's note, the following colloquy ensued:

Judge Shields:    Ladies and gentlemen, is this the consensus of all of you as to the contents

---

[5]    All references to the Trial Transcript throughout this Order are to an unedited RealTime version provided to the Court by the court reporter.

[6]    A court reporter was not present for this particular conference call.  Neither the Court nor Mr. Fieweger heard back from Mr. Carroll on Mr. Fieweger's request for a mistrial, however, presumably due to the subsequent events described below.

[7]    According to Mr. Fieweger, Judge Shields telephoned him at approximately 4:26 p.m. to advise him of the jury's note and to inform him that a mistrial would be declared. Clerk's No. 126-2 at 2.  Mr. Fieweger concurred that a mistrial was appropriate. *Id.*

of this note?  [Judge Shields individually asks each juror if this is their consensus and each juror responds "Yes"].  I am going to declare a mistrial and I want to say a few things.  I don't want to keep you, I know this has been a long period for you.  Judge Pratt wants you to know he really appreciates everything that you have done in working as hard as you have.  He wanted me to assure you that this is not a failure.  These things happen.  There are no guarantees in a lawsuit what will happen, what will not happen.  Sometimes there are just the inabilities for people to agree as to verdicts and we recognize that.  That is why there is a mistrial.  There is nothing at all that any of you should feel that lessens your service here.  We appreciate this.  We know this is a —a serious imposition on your personal and business lives, no question.  I will tell you, after I was a Judge, I served on a jury in state court so it is not as if I do not understand firsthand exactly what jurors go through.  I do.  Not to the extent that you have gone through your discussion in this case and that brings up my other point.  There are letters on the seat of your chairs.  We would request and Judge Pratt specifically has asked that you do complete those and send them back to us.  That is important to us.  Believe me.  You are why we are here and we–if we need to do a better job, then we want to know that.  If there's something about this case that we need to know about, this is your opportunity to tell us.  Now, under the rules of this Court no lawyers and no employees for lawyers or agents for lawyers may contact you without prior written approval from the Court.  If you are contacted, you have every right to say I do not want to talk about this.  If it is a persistent issue or if someone is pushing on that, you should feel free to call and ask for me, I am the Chief Magistrate Judge.  I promise you, I will resolve that issue.  You have the right not to talk to anyone about this case and that is your choice; but the lawyers specifically know that they cannot contact you and should not in that regard.  I will have this note filed, it will be part of the record.   All I can tell you is that the case will move on and we will either set another trial or it will be resolved in another way.  I don't know, no one knows at this point in time; but again, I want to emphasize, I don't want to overemphasize this, but we need trials, this is one way society sends the message as to what is right, what is wrong as things go on and that's why we certainly don't want you to feel that there has been any lack of attention on your part or any failure on your part. It is just what it is and the case will move on and I do appreciate your service more than I can tell you.  I do hope that you take away from this week and a half, almost two weeks an appreciation of how good our system really is and this is part of what the system is all about. Believe me.  I am happy to answer any questions that I can if any of you want to ask me questions. If you don't, I appreciate that too, and you can leave.  Thank you all.  Safe trips back to your home and as I said, if there's anything that we can do or anything

> you need from us, do not hesitate to call.  You are excused.
> (A recess was taken.)

Oct. 24, 2012 Hr'g Tr. at 13–17. According to the Clerk's Court Minutes, Judge Shields

addressed the jury in open court, without counsel, read the jury's note, declared a mistrial, and

"thank[ed] the jury at 4:35 p.m.  Clerk's No. 114.

The Minutes go on to state that, "[a]t 4:37 p.m., without counsel, in open Court, [the]

Court again addressed the jury." *Id*.  The transcript reflects the following colloquy:

| | |
|---|---|
| Judge Shields: | Be seated, please. Again, I apologize. We are back on the record in Case No. 3:09-cv-10.  Ms. Tracy, you were the foreperson? |
| Foreperson: | I was. |
| Judge Shields: | What I failed to ask you for on the record was there were two counts in the Complaint filed by Ms. Wagner against the Defendants and the indication of the jury was that you were unable to reach an agreement. Was that as to both Counts 1 and 2? |
| Foreperson: | The one that we were unable to reach was on Form Two. |
| Judge Shields: | I'm sorry? |
| Foreperson: | Form Two. |
| Judge Shields: | The—as to Form One? |
| Foreperson: | We were able to reach a verdict for the Defendant, Carolyn Jones. Do you need me to read what it was? |
| Judge Shields: | I will need to -- is that form signed? |
| Foreperson: | No. |
| Judge Shields: | We will—I will ask you to sign that and we will file that; but, ladies and gentlemen, then not to belabor this, it is a crazy week for all of us, I want to ask each of you, [Juror 1], was that your verdict as to Form One? |
| Juror 1: | Yes. |
| Judge Shields: | Okay.  [Juror 2], was that your verdict? |
| Juror 2: | Yes. |
| Judge Shields: | All right.  [Juror 3], was that your verdict? |
| Juror 3: | Yes. |
| Judge Shields: | [Juror 4], was that your verdict? |
| Juror 4: | Yes. |
| Judge Shields: | [Juror 5], was that your verdict? |
| Juror 5: | Yes. |
| Judge Shields: | [Juror 6], was that your verdict? |
| Juror 6: | Yes. |
| Judge Shields: | [Juror 7], was that your verdict? |
| Juror 7: | Yes. |

| | |
|---|---|
| Judge Shields: | [Juror 8], was that your verdict? |
| Juror 8: | Yes. |
| Judge Shields: | [Juror 9], was that your verdict? |
| Juror 9: | Yes. |
| Judge Shields: | [Juror 10], was that your verdict? |
| Juror 10: | Yes. |
| Judge Shields: | [Foreperson], was that your verdict? |
| Foreperson: | Yes. |
| Judge Shields: | [Juror 11], was that your verdict? |
| Juror 11: | Yes. |
| Judge Shields: | And, ladies and gentlemen, as we discussed before, as to Form Two, there was no ability to reach a unanimous decision on Form Two? |
| Foreperson: | There was not. |
| Judge Shields: | Then I am amending my Order only to the extent that the mistrial that I have ordered is as to Form Two or Count 2 and not Count 1 so again, I think your work was not for naught because that verdict stands, but the mistrial as to Count 2 or Form Two leaves that part of the case still open in my opinion. Okay. Good.  Now, I think I am done; but any—I am trying to think about this and the problem, of course, it is not my case and I didn't try it so I am trying to do the best I can from what I know. Any other questions right now? Good. Thank you all. I am not moving from here. Leave.  I need all of you to sign Count 1. |
| Foreperson: | All of us? It just states here— |
| Judge Shields: | Is it just for the foreman? Then that's fine. Some Verdict Forms require all jurors to sign, but if that one only has yours, then that's fine, Ms. Tracy, then it is done.  Thank you. |

Oct. 24, 2012 Hr'g Tr. at 17–20.

According to Mr. Fieweger, Judge Shields telephoned him at approximately 4:55 p.m. on October 24, 2012, and stated that he had accepted the jury's verdict on Count I.  Clerk's No. 126-2 at 2.  The Clerk's Court Minutes reflect that "Jury finds for defendant on count 1 but cannot reach a verdict on count 2.  Court declares a mistrial on count 2.  Court thanks jury and jury excused 4:42 pm."  Clerk's No. 114.  At approximately 9:26 a.m. on October 25, 2012, the Clerk of Court entered a Judgment in the case stating that judgment was entered in favor of

Defendants on Count I and that a mistrial was declared on Count II.[8]  Clerk's No. 125.

## II.  LAW AND ANALYSIS

### A.  *Plaintiff's Objection and Defendants' Motion to Strike*

1.      *Plaintiff's Objection.*

In Plaintiff's Objection, Plaintiff contends that she was denied her right under Federal

Rule of Civil Procedure 48(c) to "poll the jury."  Pl.'s Br. in Supp. of Objection (Clerk's No.

126-1) at 2 ("Because plaintiff was under the impression that a mistrial was going to be declared

on both counts and was never informed prior to the time in which the jury was discharged that

the court was accepting a verdict, plaintiff has been denied her fundamental rights to challenge

this verdict by polling the jury.").  Defendants resist the motion, contending that the attorneys for

both parties waived being present while the jury verdicts were announced, and pointing out that

the jury was, in fact, properly polled, both as to its ability to reach a verdict at all regarding

Count II and as to the unanimity of the verdict regarding Count I.  Defs.' Br. in Resistance to

Pl.'s Objection (Clerk's No. 127-1) at 2–4.

The Court agrees with Defendants that Plaintiff's Rule 48(c) objection must be overruled.

Rule 48(c) provides that "[a]fter a verdict is returned but before the jury is discharged, the court

must on a party's request, or may on its own, poll the jurors individually."  In this case, Judge

Shields polled the jury regarding its inability to reach a verdict generally, and then, upon

discovering that the jury had, in fact, reached a verdict on Count I, polled the jury again to

---

[8]      At approximately 11:24 a.m. on October 25, 2012, the undersigned, Judge
Shields, and counsel for both parties participated in a short telephone conference at the request of
Mr. Carroll.  *See* Oct. 25, 2012 Hr'g Tr.  Mr. Carroll expressed that he objected to a mistrial
having been declared.  *Id.* at 1.  He also renewed his motion made at trial for a directed verdict
on Count II.  *Id.*

determine the jury's unanimity as to that Count.  The Court can find no violation of Rule 48(c) under these circumstances.[9]

      2.      *Defendants' motion to strike.*

Two days after Defendants filed their resistance to Plaintiff's Objection, Plaintiff filed a "Reply to Resistance/Memorandum of Law in Support of Objection to Entry of Judgment on Count I."  Clerk's No. 129.  In a sixteen-page brief, Plaintiff goes substantially beyond the arguments made in her "Objection to Entry of Judgment on Count I," arguing that the jury verdict was compromised and inconsistent and that Judge Shields had no authority to accept the jury verdict on Count I after permitting the jury to leave the courtroom.  *Id*. at 5–15.

Defendants move to strike Plaintiff's "Reply," pointing out that it raises new arguments and exceeds the page limitation for reply briefs in violation of Local Rule 7(g).[10]  *See* LR 7(g) ("Ordinarily, reply briefs are unnecessary . . . .  However, the moving party may, within 7 days after a resistance to a motion is served, file a reply brief, not more than 5 pages in length, to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance.").  Plaintiff resists Defendants' Motion to Strike, arguing that extraordinary circumstances excuse Plaintiff's noncompliance with Local Rule 7(g) and that Defendants' Motion to Strike "blindly elevates form over substance."  Pl.'s Resistance to Mot. to Strike

---

      [9]      Plaintiff's argument about Rule 48(c) touches upon a broader argument that the polling on Count I was improper because the jury had already been discharged.  The question of whether Judge Shields could properly have done *anything* after initially declaring a mistrial, including polling the jury a second time, is addressed in detail in the Court's discussion, *infra* § II.B, of Plaintiff's Motion to Alter.

      [10]      In the event the Court denies Defendants' Motion to Strike, Defendants request that the Court alternatively consider a response brief by Defendants filed as an attachment to the Motion to Strike.  *See* Clerk's No. 131-1.

(Clerk's No. 134) at 1.

Despite Plaintiff's arguments about "extraordinary circumstances," Plaintiff easily could have requested leave of Court to file a nonconforming reply brief or to supplement her Objection.   Since she did not do so, the Court agrees with Defendants that Plaintiff's Reply should be stricken for its failure to comply with Local Rule 7(g).[11]

### B.  *Motion to Alter Judgment*

Plaintiff moves the Court to alter the Judgment in favor of Defendants on Count I, pursuant to Federal Rule of Civil Procedure 59(e).  Pl.'s Mot. to Alter at 1.   Rule 59(e), however, provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment."  Judgment in this case was entered on October 25, 2012.  *See* Clerk's No. 125.  Plaintiff did not file the Motion to Alter Judgment until November 26, 2012—32 days after the entry of judgment.[12]  Accordingly, Plaintiff's Motion to Alter Judgment pursuant to Rule 59(e) is denied as untimely.  *See Sanders v. Clemco Indus.*, 862 F.2d 161, 169 (8th Cir. 1988) (finding that "the district court loses jurisdiction over [an untimely Rule 59(e)] motion and any ruling upon it becomes a nullity").

Alternatively, Plaintiff requests relief from Judgment, pursuant to Federal Rule of Civil

---

[11]     No prejudice inures to Plaintiff from striking the Reply brief because Plaintiff has recited nearly all new arguments of the Reply brief verbatim in her Motion to Alter.  *Compare* Pl.'s Reply to Resistance/Mem. of Law in Supp. of Pl.'s Objection (Clerk's No. 129) at 6–11 *with* Pl.'s Br. in Supp. of Mot. to Alter (Clerk's No. 135-1) at 5–10.

[12]     The three-day extension of time to file under Federal Rule of Civil Procedure 6(d) is inapplicable because Plaintiff's Motion to Alter was not precipitated by a requirement that Plaintiff "may or must act within a specified time after service."  Moreover, the Court would have been prohibited from granting Plaintiff an extension of time to file the Motion to Alter under Rule 59(e), even had Plaintiff made such a request.  *See* Fed. R. Civ. P. 6(b)(2) ("A court must not extend the time to act under Rules . . . 59(b), (d), and (e) . . . .").

Procedure 60(b)(4).[13]  *Id*.  Rule 60(b)(4) permits the Court to "relieve a party or its legal

representative from a final judgment, order, or proceeding . . . [if] the judgment is void."  Here,

Plaintiff contends that Judge Shields' acceptance of the jury verdict on Count II is void because

Judge Shields had no authority to reconvene the jury after declaring a mistrial and discharging

the jury, and because Judge Shields lacked authority to question the jury about whether they had

reached a verdict on Count I after discharging them.  Mot. to Alter at 1–2.

    The record supports the following facts regarding the events of October 24, 2012.  After

giving the *Allen* charge to the jury, the Court received a note stating, "We are still unable to

come to an [sic] unanimous verdict.  I DO NOT SEE US EVER AGREEING."  Judge Shields

brought the jury into the courtroom, polled each juror individually regarding whether each

agreed with the contents of the note (i.e, regarding an inability to reach a unanimous verdict),

informed the jurors that he was "declaring a mistrial," and told them "you can leave.  Thank you

all. Safe trips back to your home . . . [y]ou are excused."  Oct. 24 Trial Tr. at 13–17.  Within two

minutes, Judge Shields had the jurors brought back into the courtroom, and inquired as to

whether their note pertained to both counts of Plaintiff's Complaint.  *Id*. at 17; Clerk's No. 114.

The foreperson of the jury responded that the jury had, in fact, reached a unanimous verdict on

Count I of the complaint in favor of Defendants and that "[t]he one that we were unable to reach

---

[13]    Defendants argue that Plaintiff's Motion to Alter is not cognizable under Rule
60(b)(4) because the present case does not present one of the rare types of infirmities held to
support such a motion.  *See* Defs.' Br. in Supp. of Resistance to Pl.'s Mot. to Alter (Clerk's No.
139-1) at 1–3 (citing *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010)).  While
the Court agrees with Defendants, Plaintiff also raises Judge Shields' acceptance of the jury
verdict on Count I as a basis for her Motion for New Trial.  Accordingly, to the extent that
Plaintiff's complaints in this section are cognizable under *any* rule, the Court will address the
merits of Plaintiff's arguments to ensure a complete resolution of Plaintiff's objections to the
entry of judgment in favor Defendants on Count I.

was on [Count] Two." Oct. 24, 2012 Trial Tr. at 17.  Judge Shields polled each juror regarding

the verdict on Count I, and upon receiving confirmation that all jurors were in agreement,

requested that the foreperson sign the as yet-unsigned verdict form[14] to memorialize the jury's

unanimous finding.  *Id*. at 17–19.  He thereafter amended his prior order by accepting the verdict

on Count I and declaring a mistrial on Count II.  Judge Shields then discharged the jury.  *Id*. at

19–20.

Plaintiff urges that once Judge Shields declared a mistrial and excused the jury, "he had

no discretion to reconvene the jury to accept some alleged (and unsigned) verdict in favor of

defendant on Count I."  Pl.'s Br. in Supp. of Mot. to Alter at 4.  In support, Plaintiff cites

*Gugliotta v. Morano*, 829 N.E. 2d 757, 762–64 (Ohio Ct. App. 2005) and *Ross v. Petro*, 515 F.3d

653 (6th Cir. 2008).

In *Gugliotta*, the jury had engaged in several days of deliberation without a verdict.  829

N.E.2d at 762.  The court sent a note to the jury to inquire whether they anticipated being able to

reach verdicts with further deliberations on the same day and the following day.  *Id*.  The jury

responded in the negative.  *Id*.  The jury was brought into the courtroom and the judge polled

each juror regarding their inability to reach verdicts.  *Id*.  After all jurors agreed, the judge

advised the jurors they were free to discuss the case and requested they return to the jury room

until he came back to dismiss them.  *Id*. at 762–63. The judge then went to the jury room and

was advised by the foreperson that the jury may have misunderstood the judge's polling

question.  *Id*. at 763.  According to the foreperson, the jurors did not believe they could reach a

---

[14]        The verdict form contains two "Forms" to be filled in—one for each of the two
Counts.  *See* Clerk's No. 116.  The verdict form as a whole, however, contains only a single
signature line.  *Id*.

verdict within the two days referenced in the judge's note, but did believe they could reach a verdict in a longer period of time.  *Id*.  The jury was returned to the courtroom, re-polled as to whether they could reach verdicts at any time if permitted to continue deliberations, and upon responding that they could, were told by the judge to continue their deliberations.  *Id*.

The plaintiff objected to permitting the jury to continue deliberations, arguing that it was an error to permit the jury to continue deliberations after it had been discharged and that the jury was tainted by the trial judge's off-the-record contact with them.  *Id*.  The judge then called each juror individually into the courtroom and asked what the juror recalled about the judge's contact with them and whether "anything the judge said in the jury room outside the presence of counsel or the court reporter had prejudiced that particular jurors' ability to deliberate or form an opinion of the case."  *Id*.  One juror reported that the judge had asked what the jurors "thought of the case" and that the judge "said the jury was dismissed and then the jurors began asking questions and the judge answered the jurors' questions."  *Id*. at 763–64.  A second juror began crying on the witness stand and indicated that the emotional state of the jury changed after the judge told them they were dismissed.  *Id*. at 764.  The trial judge ultimately determined, however, that her ex parte communications with the jury had not prejudiced the jury and the jury was permitted to continue its deliberations.  *Id*.  The jury ultimately reached a verdict in favor of the defendant and the plaintiff appealed.  *Id*.  Relying on "'well established [law] in Ohio that once a jury has returned its verdict and has been discharged, it cannot be reconvened to alter or amend its verdict,'" the Ohio Court of Appeals determined that the trial judge abused her discretion in permitting the jury to continue deliberations because the "jury in the instant matter was discharged in open court and without reaching a verdict."  *Id*. at 762, 764 (citations omitted)).

-14-

In *Ross v. Petro*, deliberating jurors told the judge in a note that they believed one of their fellow jurors was "agreeing with the group [merely] to expedite the process." *Id*. at 657.   The judge decided, based solely on the note, that the juror had engaged in misconduct that "impeded full and fair deliberation of the evidence by other jurors." *Id*. at 658.   Accordingly, she declared a mistrial on all pending criminal counts and discharged the jury on the record.  *Id*.   Shortly thereafter, the judge met with the jury in the jury room.  *Id*.   She explained what she had done and invited the jurors to speak with her individually in her chambers.  *Id*.   Five jurors spoke individually with the judge and, during one of these meetings, the judge learned that the jury had unanimously completed and signed verdict forms on several of the counts.  *Id*.   The judge instructed the bailiff to retrieve the verdict forms and released the jurors.  *Id*.   After the jurors had left the building, the judge informed counsel of the existence of signed verdict forms.  *Id*. When a retrial was set, the defendant moved to bar the proceedings on double jeopardy grounds. *Id*.   A different judge found there had been no "manifest necessity for declaring a mistrial" and barred the retrial.  *Id* at 659.  *Id*.

Relying on *Gugliotta*'s "teach[ing]" that a trial court's authority to reconsider an order discharging the jury is narrowly circumscribed and must be justified by the particular facts presented," the Sixth Circuit upheld the second judge's decision under Ohio law.  *Id*. at 665. The Court noted that, although the complete details of the first judge's ex parte communications with the jurors remained undisclosed, it was clear that the first judge had told at least one juror that there was additional evidence that had not been disclosed, and that the judge had tried to "accommodate the emotion in the room" after jurors became upset at the announcement of a mistrial.  *Id*. at 665–66.  "[T]hese facts, of which [the judge] was necessarily aware, substantiate

the 'potential for prejudice' much more strongly than the circumstances which, in *Gugliotta*, were held to foreclose reconvening the jury after it had been discharged." *Id*.

Plaintiff urges the Court to follow *Gugliotta* and *Ross*, contending that it is "obvious from the transcript of proceedings that this jury was discharged in open court without reaching a verdict and Judge Shields abused his discretion when he reconvened this jury after explicitly declaring a mistrial and discharging the jury." Pl.'s Br. in Supp. of Mot. to Alter (Clerk's No. 135-1) at 8. Plaintiff further contends that, prior to recalling the jury to the courtroom, there "was no indication whatsoever from this jury that they had reached a verdict as to Count I." *Id*. at 9. While Plaintiff concedes that there is no evidence in the record that Judge Shields engaged in ex parte communications with the jury, she nonetheless contends that the sequence of events supports "a conclusion of intervening ex parte communications between Judge Shields and the jurors, creating at least a substantial 'potential for prejudice,' which should have foreclosed the reconvening of the jury."[15] *Id*. at 10.

The Court finds Plaintiff's arguments unconvincing and concludes that there was no error in Judge Shields' acceptance of the jury's verdict on Count I. *Gugliotta* and *Ross* both arise under Ohio case law, which is not binding on this Court. Even if the Court were to follow

---

[15]     Plaintiff goes even farther in the next section of her brief, asserting that "there can be no dispute that whatever occurred must have involved Judge Shields receiving testimony from the jurors after the mistrial had been declared and after the jury had been discharged." Pl.'s Br. in Supp. of Mot. to Alter at 11. Likewise, Plaintiff contends that Judge Shields' statements to the *Iowa City Press Citizen* make it "apparent that not only had the jury been excused, but they had left the courtroom, and it was only after judge Shields spoke with jurors outside the presence of anyone that he reconvened this jury." *Id*. at 9. Notably, all the *Press Citizen* article states is that, "By the time Shields realized the jury had not reported its verdict for the individual claims, reporters and the jurors already had left the courtroom, [Shields] said. The jury was brought back in and reported that it decided in favor of the defendant in one claim and could not reach a decision on the other." *See* Clerk's No. 135-2.

*Gugliotta* and *Ross*, however, it would not mandate the result Plaintiff desires.  Indeed, both cases clearly recognize that the question of the validity of any action taken after a jury is discharged "must be answered on a case-by-case basis."  *Gugliotta*, 829 N.E.2d at 762; *see also Ross*, 515 F.3d at 664 ("[T]he authority of a trial court under Ohio law to reconsider its decision after having discharged the jury in open court is limited—even before the journal entry has been made.  It is a determination that must be made 'on a case-by-case basis based upon the facts of each particular situation.'" (citing *Gugliotta*, 829 N.W.2d at 762)).

Here, despite Plaintiff's assertion that there is "no indication whatsoever" from the jury that they had a verdict on Count I, the jury's note, in fact, actually contained no indication whatsoever as to whether they were deadlocked on either or both of Counts I and II.  The Court recognized this fact in a reported conversation on October 24, 2012 with counsel present.  *See* Oct. 24 Trial Tr. ("[S]o my first question is we don't know if this pertains to one of the submitted counts or both of the submitted counts, I am assuming, maybe this is an assumption I should not make, it pertains to both counts that the jury has, the discrimination claim and the equal protection claim . . . .").  Given that Judge Shields' first poll of the jury simply asked whether the note accurately reflected the jurors' consensus, Plaintiff's assertion that "Judge Shields' polling of the jury established that they unanimously agreed that they had not reached a verdict on either Count I or II" is without merit.  *See* Pl.'s Br. in Supp. of Mot. to Alter at 11.

The present case is also factually distinguishable from both *Gugliotta* and *Ross* in that, here, the record is devoid of any evidence that Judge Shields' engaged in any ex parte communications with the jury whatsover.  Although Plaintiff speculates that Judge Shields must have engaged in some impropriety, the exceedingly short period of time the jury was absent from

-17-

the courtroom undermines such an assertion.  Moreover, upon being asked if their inability to

reach a verdict pertained to both counts, the jurors clearly informed the Court *on the record* that

they had already, in fact, unanimously reached a verdict on Count I and were only deadlocked on

Count II.  The jury had neither the time nor the opportunity to engage in any additional or further

deliberations after leaving the courtroom the first time.  Under these circumstances, the Court

finds no indication on the record that any impropriety existed that created any potential for

prejudice either for or against the Plaintiff.[16]

Finally, the Court finds it particularly significant that the jury room is in a secure area of

the courthouse.  When the jurors exited the courtroom for the approximately two minutes after

Judge Shields polled them on the contents of their note, they remained at all times in this secure

area of the courthouse.  This is important because, although Judge Shields informed the jurors

that they were "excused," they remained at all times in the control of the Court and were

inaccessible to any outside influences.  This Court agrees with the numerous federal courts that

---

[16]     Although the Court does not consider the information in this footnote in any way in conducting its legal analysis and deciding the issues before it, it notes that, in representations to the undersigned, Judge Shields firmly denies any improper ex parte communications.  He states that he polled the jurors about the note and excused them from the courtroom.  As he was gathering his papers from the bench, he recalled that there were two separate counts and realized that he had not polled the jury regarding the separate counts.  Within moments of the jury's exit from the courtroom, Judge Shields personally walked to the jury room and, upon finding all twelve jurors still present, asked the jury to return to the courtroom so that he could ask them a few additional questions.  According to Judge Shields, his *only* communication with the jury was requesting that they return to the courtroom and this communication was made to the jury with all twelve jurors present, with the jury room door open, and with a Court Security Officer present.  Once the jurors had reassembled, Judge Shields made the record reflected *supra*.

The Court Deputy present in the courtroom on October 24, 2012 also confirmed to the undersigned that, immediately after the jury exited the courtroom, Judge Shields, while still on the bench, stated something akin to "I didn't ask them about the individual counts."  He thereafter walked to the jury room, and returned almost immediately to the bench with the jury following closely behind.

have held a jury remains "undischarged" and subject to recall by the court under such

circumstances.[17]  *See United States v. Figueroa*, 683 F.3d 69, 72–73 (3d Cir. 2012)[18]; *United*

---

[17]     The Court finds no merit in Plaintiff's objection to the fact that the verdict form had not yet been signed by the jury's foreperson.  The jury orally informed the Court that it reached a unanimous verdict on Count I.  Each individual juror was polled as to whether they, in fact, found in favor of Defendants on Count I.  The jury had reached a substantive decision and was polled on that decision before Judge Shields even discovered that the verdict form had not yet been signed.  Thus, there was nothing improper about Judge Shields' request that the foreperson sign the verdict form to commemorate the oral record that had already been made.  As the Court' Final Jury Instructions makes clear, "the verdict form is simply the written notice of the decision you reach in this case."  Final Jury Instruction 12 (Clerk's No. 107 at 17).

[18]     In *Figueroa*, Carlos Figueroa faced a trial on three counts, with a bifurcated portion of the trial to follow on a fourth count.  683 F.3d at 72.  The jury reached verdicts on two counts in the first phase of the trial, but was unable to reach a verdict on the third count.  *Id*.  The trial judge accepted the jury's verdicts on counts one and two, "thanked the jury members for their service and released them."  *Id*.  "Immediately upon their exit, the chief of the firearm section of the U.S. Attorney's Office . . . presented himself to the court and asked that the jury be held so [the bifurcated fourth count] could be further discussed."  *Id*.  The trial judge "immediately sent a court employee to hold the jury," and after a bit of research, "concluded that she would bring the jury back into the courtroom to consider Count Four."  *Id*.  Thereafter, the jury returned to the courtroom, the trial judge "rescinded her prior dismissal," the parties presented evidence on count four, and the jury ultimately reached a guilty verdict on that count. *Id*.

Figueroa appealed his conviction on count four, arguing that his due process and double jeopardy rights had been infringed because "[n]ever before . . . has a judge asked for the opinions of both parties regarding dismissing a jury reached a decision on the record regarding the issue, proceeded to dismiss the jury, and then reconvened the same jury and presented it with new evidence regarding an additional criminal charge."  *Id*. at 73.  Recognizing that the "discharge or release of jurors can be problematic, because, upon release, they become susceptible to outside influences," the Third Circuit nonetheless found no error in the process employed by the trial judge:

> In cases such as Figueroa's, the pivotal inquiry is whether the jurors became susceptible to outside influences. "When a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled." [*United States* v.] *Marinari*, 32 F.3d [1209,] 1213 [(7th Cir. 1994)] (citing *Summers v. United States*, 11 F.2d 583 (4th Cir.1926)); *see also United States v. Rojas*, 617 F.3d 669, 678 (2d Cir. 2010) ("It is significant that, although the jury had technically been declared 'discharged' by the court, it had not dispersed.").  As the Fourth Circuit long ago stated, "the mere announcement of [the jury's] discharge does not, before they have dispersed and

*States v. Rojas*, 617 F.3d 669, 677 (2d Cir. 2010) ("The mere incantation of the word

'discharged' marks only a time when the jurors have been discharged nominally.")[19]; *United*

*States v. Marinari*, 32 F.3d 1209, 1214 (7th Cir. 1994) ("Until the jury is actually discharged by

separating or dispersing (not merely being declared discharged), the verdict remains subject to

review."); *Summers v. United States*, 11 F.2d 583, 586 (4th Cir. 1926) ("[The jury] may remain

undischarged and retain its functions, though discharge may have been spoken by the court, if,

after such announcement, it remains an undispersed unit, within control of the court, with no

opportunity to mingle with or discuss the case with others, and particularly where, as here the

very case upon which it has been impaneled is still under discussion by the court, without the

intervention of any other business."); *State v. Stewart*, No. 2001-P-0035, 2002 WL 31886657, at

*3 (Ohio Ct. App. Dec. 27, 2002) (finding no error where judge misunderstood jury's decision,

declared a mistrial, discovered error, brought jury back into courtroom, and accepted verdict on

---

mingled with the bystanders, preclude recalling them." *Summers*, 11 F.2d at 586
(citing Austin Abbott, *A Brief for the Trial of Criminal Cases* 730 (2d ed. 1902)).

In this case, the jury returned its verdict as to Counts One and Two, and notified the
District Court that it could not reach a verdict as to Count Three. The District Court
below retained control of the jury at all times after it informed the jurors they were
released. The jurors did not disperse and interact with any outside individuals, ideas,
or coverage of the proceedings. Thus the fact that the jury was momentarily released
did not subject them to outside influence. Accordingly, the District Court did not err
by reconvening the jury for Count Four.

*Id*.

[19]      In *Rojas*, the courtroom deputy incorrectly read the jury's verdict when
publishing it in open court.  617 F.3d at 673.  After the jury had been polled, declared
"discharged," and exited the courtroom, the error was discovered.  *Id*.  The jurors were
reassembled over the objection of the defendant, the verdict was reread, and the jury
was repolled and discharged a second time.  *Id*.  The appellate court found no error in the trial court's
procedures, noting that since the jury had not dispersed, it "retained its function" as a jury
subject to recall.  *Id*. at 678.

some counts); *Brown v. Gunter*, 562 F.2d 122, 125 & n.1 (D. Mass. 1977) (finding it permissible for an undispersed jury to be recalled the courtroom to correct an inaccurately read verdict and explicitly rejecting a state court rule similar to that in *Gugliotta* as "merely adopt[ing] a rule of trial procedure without reference to constitutional law").

### C. *Plaintiff's Motion for New Trial*

Plaintiff next requests that the Court grant a new trial, pursuant to Federal Rule of Civil Procedure 59(a).  In particular, Plaintiff contends that she is entitled to a new trial because:  1) Judge Shields lacked authority to accept the jury's verdict on Count I; 2) the Court prohibited Plaintiff from questioning jurors about their opinions on same sex marriage and abortion during voir dire; 3) the Court permitted certain cross-examination of Professor Mark Osiel; 4) the Court declined a jury request to view Randall Bezanson's deposition testimony; 5) the Court improperly sustained certain hearsay objections during Plaintiff's case-in-chief; 6) the Court declined to give certain of Plaintiff's proposed jury instructions; 7) the Court gave a business judgment instruction to the jury; and 8) the Court declined to provide an additional instruction on the meaning of "acting under color of state law" to the jury.  Mot. for New Trial at 1–3.

Federal Rule of Civil Procedure 59(a)(1) provides:  "The court may, on motion, grant a new trial on all or some of the issues—and to any party . . . (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  The power to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court."  *Allied Chem. Corp. v. Daiflon,* 449 U.S. 33 (1980).  While a trial court unquestionably has the discretionary power to grant a new trial, the role and function of the jury is not to be trivialized.  "The district court can only disturb a jury verdict to prevent a

miscarriage of justice." *Beckman v. Mayo Found.*, 804 F.2d 435, 439 (8th Cir. 1986) (citing *McGee v. S. Pemiscot Sch. Dist. R-V*, 712 F.2d 339, 344 (8th Cir. 1983)).  Erroneous evidentiary rulings warrant a new trial only where they affect "the substantial rights of the parties."  Fed. R. Civ. P. 61; *Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1270 (8th Cir. 1997).  Erroneous jury instructions warrant a new trial only where the objecting party can show that it was materially prejudiced by the erroneous instruction.  *See Fink v. Foley-Belsaw Co.*, 983 F.2d 111, 114 (8th Cir. 1993).

      1.     *Judge Shields' acceptance of jury verdict.*

The Court has already considered and rejected Plaintiff's arguments regarding Judge Shields' authority to accept the jury's verdict on Count I.  For the same reasons discussed *supra* § II.B, the Court declines Plaintiff's request for a new trial on this basis.  The Court, therefore, turns to Plaintiff's additional arguments in support of a new trial.

      2.     *Prohibitions on voir dire.*

Plaintiff asserts that the Court abused its discretion by refusing to permit Plaintiff's counsel to "inquire of the jurors regarding their positions on abortion and same sex marriage." Pl.'s Br. in Supp. of Mot. for New Trial (Clerk's No. 133-1) at 4–5 ("[P]laintiff's counsel's recollection is that this Court expressly forbade plaintiff's counsel from inquiring as to those two areas . . . [i]t was imperative that plaintiff's counsel be allowed to inquire regarding the abortion and same sex marriage issues to ensure plaintiff's right to have an impartial jury in this case."). Defendants respond that Plaintiff failed to preserve error on this issue, and that even if she had, the Court acted well within its wide discretion over the scope of voir dire.  Defs.' Br. in Resistance to Pl.'s Mot. for New Trial (Clerk's No. 137-1) at 3–4.

The following colloquy contains the only record prior to or during voir dire where the

Court even arguably limits the scope of Plaintiff's voir dire in any way:

| | |
|---|---|
| The Court: | I want to talk about the voir dire because both of you have expressed an interest in it.  Here is where I am coming from on it so you know my position.  I am worried about the intrusiveness of asking them about their political, social views.  Many of them as you know from experience comment that they are reluctant to serve and I always tell them at the outset that they have privacy rights, that we don't want to interfere with so I guess I just want a general discussion.  I think the assumption, Mr. Fieweger, in your brief, and I am referring to the voir dire discussion in your pretrial brief, is it is necessarily true because one holds strong, quote, liberal views or conservative views the idea that one cannot be a judge of what the facts are I don't think necessarily correlates.  Having said that, I think you are both correct to some extent, that we, you know, should delve into it.  Here is what I am going to do, my voir dire, we are going to take a recess, and then you can voir dire, Mr. Fieweger first, then Mr. Carroll; but *we are not going to have a checklist of your position on abortion, gay marriage, affordable care act, gun control, just not going to do that.  Okay*? |
| Mr. Fieweger: | Okay. |
| The Court: | I have been led to believe that their party registration in a county auditor's office is, in fact, public record.  People told me that, I don't know if that is true or not. |
| Mr. Fieweger: | It is. |
| Mr. Carroll: | It is true. |
| The Court: | I guess in that sense we are not, quote, invading their privacy so you know, have at it in terms of their party registration.  Some of them, you know, you may be hurting yourselves, but that's a judgment call you all [] have to make, not me. . . .[20] |

---

[20]   The following colloquy continued several minutes later:

| | |
|---|---|
| The Court: | I think most of your [voir dire] questions frankly will be hit on by me.  I am going to make a corollary here because I think it is a good one . . . I am requesting to tell them that frequently I have to apply law that I don't think ought to be the law.  Here is my point.  I think a strong liberal could rule for the Plaintiff here.  I think an equally strong conservative could rule for the Defendant.  I don't think one's political views necessarily dictate the outcome of the case.  Having said that, there is, as both of you have acknowledged, a political, quote, unquote, aspect to this case that I think we have to deal with. . . .  Do either of you see any problems with any of the proposed voir dire of the other side? |

Oct. 15–17 Trial Tr. at 1–2 (emphasis added).

While the Court does not doubt the sincerity of Mr. Fieweger's assertion, it simply

cannot agree that the emphasized language can be construed as "expressly forbidding" counsel

from questioning jurors about their views on abortion or same sex marriage.  While the Court did

prohibit counsel from questioning each and every juror about their specific political views on

hot-button topics in a "checklist" fashion, counsel was not constrained in the manner alleged.

Indeed, a review of the actual voir dire demonstrates that the venire was extensively questioned

about their ability to be impartial in light of the Plaintiff's "strong political views" and

Republican party "activism."  *See, e.g.*, Oct. 15–17 Trial Tr. at 64 (The Court:  "Ms. Wagner

based upon what the lawyers tell me has strong political views and she asserts . . . that as a result

of those views, she was denied employment so it may be that what your political views are has

---

| | |
|---|---|
| Mr. Fieweger: | I don't. |
| Mr. Carroll: | No. |
| . . . | |
| The Court: | Any questions that either the plaintiff or Defendant feel are better coming from me and less likely to erode your credibility with the jury because if there are, I will ask them. |
| Mr. Carroll: | I actually think to the extent we are delving into any political beliefs, I think it is better it comes from how the registrations are public, they are not easy to access publicly, but you could go down to—that's how we get into this, we have a huge [newspaper] article about Iowa so I prefer you did that. |
| Mr. Fieweger: | I agree. |
| Mr. Carroll: | Then we have that. |
| Mr. Fieweger: | I wouldn't want to be foreclosed in finding out, for example, if they are a Democrat and they say something to the effect well, I am also a precinct person, he'd be somebody I may want to ask something more of than just the regular run of the mill person who goes and votes every election because that could indicate they have more of an activism with their politics. |
| The Court: | Okay. |

*Id*. at 5–8.

something . . . to do with your ability to serve.  Because Ms. Wagner is a strong advocate of her

position and what we would call an activist—does that—and she is a member of the Republican

party, is there something about that, because of your own background or your own political

views . . . that would make it impossible or difficult . . . to serve as a fair and impartial juror?");

*id*. at 69, 71, 72, 75, 76, 77, 82, 83, 84, 85 (Mr. Fieweger questioning the venire about their

political affiliations, the extent of their activism, and their political donations); *id.* at 83 (Mr.

Fieweger:  "You will hear my client is a registered Republican and is active in her causes.

Anything about that cause you to say I don't want to listen to that?").

Moreover, the Court must agree with Defendants that Plaintiff did not preserve error on

this issue.  *See Hicks v. Mickelson*, 835 F.2d 721, 724 (8th Cir. 1987) (finding that only a plain

error analysis would be applied where it did "not appear from the record that counsel . . .

objected to the limitation of voir dire . . . .  In order for us to review challenges of the district

court's rulings, the district court must be advised by counsel on the record of his objection of the

relief requested").  At no time after the Court imposed the above restriction did Plaintiff's

counsel object, request broader questioning, or express that Plaintiff was hampered in any way in

attempting to select a fair and impartial jury through the voir dire process.[21]  Accordingly, on the

record before it, the Court cannot say that any limitation imposed on Plaintiff's voir dire was "so

prejudicial as to cause a miscarriage of justice," such that a new trial would be warranted.  *Id.*

---

[21]      Plaintiff's counsel essentially conceded his failure to object at the conclusion of
trial.  *See* Oct. 17–22, 2012 Trial Tr. at 104–05 (Mr. Fieweger:  "I do want to make one thing for
the record.  I didn't object to this at the time of voir dire, but the Court precluded me from asking
questions about their political positions, in particular about pro life versus pro choice."  The
Court:  "I didn't preclude you, counsel."  Mr. Fieweger:  "You said we were not going to ask
questions of the jury panel."  The Court:  "I didn't say that at all."  Mr. Fieweger:  "I believe you
did."  The Court:  "The record will say whatever it says.").

3.     *Mark Osiel*.

Plaintiff next contends the Court should grant a new trial because it improperly permitted

Defendants to cross-examine Mark Osiel about an allegation of misconduct.  Pl.'s Br. in Supp. of

Mot. for New Trial at 5–8.  During trial, the following colloquy occurred:

| | |
|---|---|
| Mr. Carroll: | Professor Osiel, were you recently accused of misconduct in your office at the University of Iowa College of Law? |
| Mr. Fieweger: | Objection. |
| The Court: | Sustained. |
| Mr. Carroll: | Your Honor, I believe it goes to the bias and motive of this witness. |
| The Court: | 404, 403, what? What rule, counsel? |
| Mr. Carroll: | Bias and motive of the witness. |
| The Court: | Is it 404(b)? / |
| Mr. Carroll: | It is not reputational evidence, it is specific misconduct that, in fact goes to that. |
| The Court: | Okay. You can lay foundation. |
| Mr. Carroll: | Were you accused of misconduct by the University of Iowa in the recent past? |
| Mr. Osiel: | Associate Dean Eric Andersen came to my office and informed me that someone passing by my office had thought they had heard something resembling the sounds of sexual activity there to which I responded that because of my hip arthritis, I have to do exercises that are very painful and that cause me to emit some sound. |
| Mr. Carroll: | And, in fact, were you interviewed by the University of Iowa Office of Equal Opportunity and Diversity? |
| Mr. Fieweger: | Objection.  Irrelevant and immaterial. |
| Mr. Osiel: | No, I was not. |
| The Court: | Overruled. |
| Mr. Carroll: | You were not? |
| Mr. Osiel: | No, I was not. |
| Mr. Carroll: | Were you interviewed by anybody about that allegations? |
| Mr. Osiel: | There was only the conversation with Dean Andersen and there was an e-mail note following up on that from—from the current Dean telling me that as a matter of law it would constitute sexual harassment if somebody felt harassed by hearing sounds of sexual activity as they pass by someone's office. |
| Mr. Carroll: | Did you tell professor Andersen that what you did in your office at the University of Iowa was your business? |
| Mr. Osiel: | I did tell him that.  I also told him that I was engaged in exercises in particular with my hip arthritis. |
| Mr. Carroll: | You understand your office at the University of Iowa is in a public |

|              | building?  |
|--------------|------------|
| Mr. Osiel:   | I do.      |

Oct. 15–17, 2012 Trial Tr. at 298–300.

Later, Defendants' counsel engaged in the following colloquy with Eric Andersen:

| Mr. Carroll:   | Professor Andersen, in your role as Associate Dean would it be appropriate for individuals to bring to your attention alleged violations of University rules or policies? |
|----------------|---|
| Mr. Andersen:  | Yes, it would. |
| Mr. Carroll:   | And as associate dean would it be your role to look into such allegations if it involved a faculty member? |
| Mr. Andersen:  | In consultation with my Dean it would be. |
| Mr. Carroll:   | And did there come a point in time that an allegation of alleged violation, only alleged violation, came to your attention regarding Professor Osiel and violation of University of Iowa policies and procedures? |
| Mr. Andersen:  | I am not sure violation is the word I would use, but there was a concern raised about—by a staff member about Professor Osiel . . . and I was asked to deal with that. |
| Mr. Carroll:   | No further questions. |
| . . .          | |
| Mr. Fieweger:  | I move to strike that with no foundation. |
| The Court:     | Your Motion is . . . overruled. |
| . . .          | |
| Mr. Fieweger:  | It was unfounded, correct? |
| Mr. Andersen:  | No, that's not correct. |
| Mr. Fieweger:  | There was no discipline? |
| Mr. Andersen:  | No discipline, but that doesn't mean the report was unfounded. |
| Mr. Fieweger:  | And you haven't give us a time, date, or place where this occurred, have you? |
| Mr. Andersen:  | I have not. |
| Mr. Fieweger:  | No further questions. |

*Id.* at 420–22.

At the lunch recess on the same day, the Court made further record with counsel on

Osiel's testimony.  Oct. 15–17, 2012 Trial Tr. at 746–750.  Mr. Fieweger made various

objections in support of a request to strike all testimony related to Osiel's alleged misconduct,

and Mr. Carroll responded.  *Id.*  The Court declined to strike the testimony, finding that

"[e]xtrinsic evidence of misconduct may be used to show that a witness was motivated by bias, interest, or influence and the misconduct may show hostility or animus to a party.  The fact is that there was an investigation . . .  I think it is being offered to show that it is perhaps animus against Defendant because of the investigation, not because of the alleged act."  *Id.* at 749.  The Court proposed a limiting instruction to be provided to the jury, and Mr. Fieweger reserved his decision on whether such an instruction should be given.  *Id.* at 749–50.  Ultimately, Mr. Fieweger declined to have the Court's proposed limiting instruction read to the jury.

Both at trial and in their resistance brief, Defendants asserted that the "purpose of this cross examination and related testimony was to expose Osiel's bias:  since he had [been] investigated by the law school, he might have an interest in testifying against and thus injuring the law school."  *Id.* at 299; Defs.' Br. in Resistance to Pl.'s Mot. for New Trial at 4–5.  Extensive record was made on this matter during the course of trial.  Ultimately, the court remains convinced, as it was at trial, that it was proper to permit Defendants to ask Osiel whether he had been investigated by the University.  There can simply be no doubt that an individual subjected to an investigation into his conduct, whether justifiably or not, might harbor some ill-will toward those conducting the investigation.  *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

Plaintiff characterizes Defendants' cross-examination of Osiel as an "improper" and "unwarranted" "attack" and "smear campaign," and contends that there were "two enormous problems with it."  Pl.'s Br. in Supp. of Mot. for New Trial at 5–7.  First, Plaintiff asserts that

Defendants' entire argument about bias was "nonsensical," because the University's investigation of Osiel occurred only a few months prior to trial. *Id*. at 6. According to Plaintiff, Osiel had written a letter in support of Wagner two years before trial, and had written letters to the State Legislature regarding discriminatory practices at the University of Iowa at least nine years before. *Id*. "Obviously, this predates any allegation or investigation into Mr. Osiel's conduct in the last few months." *Id*.; *see also id*. at 7 ("Defendant was allowed to imply to this jury that Mr. Osiel was testifying adversely to defendant in this case not because it was perfectly consistent with what he had been arguing and writing for years, but because of some nebulous retribution for some unfounded claim that he was having sex in his office."). The second "enormous problem" Plaintiff points to is "that this Court completely failed to perform its required duties as gatekeeper under Rule 404(b) <u>prior</u> to allowing this evidence that was of clearly such a prejudicial nature. *Id*.

The Court finds Plaintiff's characterization of the cross-examination as an improper and unwarranted attack against Osiel to be without merit. Indeed, the record belies Plaintiff's contention, demonstrating that Defendants' counsel merely asked Osiel whether he had been investigated. It was Osiel who "volunteered" information about the purpose of the investigation and that the fact that it related to alleged sexual misconduct. Similarly, the Court believes that Plaintiff's "nonsensical" argument misses the mark. A pertinent question the jury had to consider was whether Osiel's testimony was influenced by any bias he might have harbored against the University. Regardless of any prior actions by Osiel in support of Plaintiff or against the University, the University's investigation of Osiel *could have* influenced his testimony at trial. Whether it did or did not was a matter for the jury to determine.

The Court likewise rejects Plaintiff's 404(b) arguments.  Federal Rule of Evidence 404(b) states that "[evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Defendants' question about whether Osiel was investigated by the University, however, was not offered or admitted to prove that he was acting in conformity with prior behavior.  It was offered and admitted as probative of Osiel's potential bias against Defendants.  *See* Fed. R. Evid. 608, Advisory Comm. Notes ("Opinion or reputation that the witness is untruthful specifically qualifies as an attack under [Rule 608], and evidence of misconduct, including conviction of crime, and of corruption also fall within this category.  *Evidence of bias or interest does not*." (emphasis added)); *Johnson v Brewer*, 521 F.2d 556, 562–63 & n.13 (8th Cir. 1975) ("But so far as being 'collateral,' or provable by extrinsic testimony, is concerned, it is the universal holding of the authorities that as to bias the cross-examiner is not bound by the answer.").  In short, under the circumstances in this case, the Court does not believe that Defendants' cross-examination of Osiel violated the Federal Rules of Evidence.  Even if a technical violation occurred, however, the Court does not believe it was sufficiently severe or prejudicial to be considered a "miscarriage of justice" or that it affected the "substantial rights of the parties."  *See Beckman*, 804 F.2d at 439; *Anderson*, 128 F.3d at 1270.  Accordingly, the Court declines to grant Plaintiff's request for a new trial on this basis.

        4.    *Randall Bezanson's deposition.*

On October 23, 2012, during deliberations, the jury sent the following note to the Court: "Would it be possible to receive a copy of [Randall] Bezanson's deposition?"  Clerk's No. 117.  Plaintiff's counsel requested that the Court permit the testimony to be read to the jury, but

Defendants' counsel requested that the Court deny the request to avoid overemphasizing any particular witness' testimony. *See* Oct. 23, 2012 Trial Tr. at 1–3. The Court declined to permit the jury to review the deposition, and Judge Shields provided the jury with a written response, which read: "Consistent with the instructions given you by United States District Judge Robert W. Pratt you will not be provided with a copy of the transcript of any portion of the trial, and you will not be provided with a copy of Professor Bezanson's deposition." Clerk's No. 117-1.

Plaintiff asserts that the Court abused its discretion by denying the jury's request to view this deposition testimony during its deliberations on the morning of October 23, 2012. Pl.'s Br. in Supp. of Mot. for New Trial at 8. In particular, Plaintiff contends:

> Bezanson was the primary opponent to plaintiff and thus the chief witness on the political discrimination claim. His deposition testimony had been read to the jury a full week prior to the jury's request to view that deposition. Counsel for both parties had characterized Mr. Bezanson's deposition testimony during their closing statements. Accordingly, this Court erred in refusing the jury's request under these circumstances and this error was highly prejudicial to plaintiff in the event any alleged verdict is argued to exist as to Count I.

*Id.*

Bezanson's deposition testimony was read into evidence during trial, along with that of several other witnesses. It was not received as an exhibit. The Court specifically instructed the jurors in Preliminary Instruction Number 11 that, although there was an official court reporter making a record of the trial, "we will not have typewritten transcripts of this record available for your use in reaching your verdict." Clerk's No. 103 at 15. Other than implying that the jury might have viewed Plaintiff's claim on Count I more favorably if it had been permitted to see or review the transcript, Plaintiff provides no compelling argument as to how she was prejudiced by the ruling or why it warrants a new trial. The Court was well within its discretion to decline the

jury's request in this regard.  *See Johnson v. Richardson*, 701 F.2d 783, 757 (8th Cir. 1983)

("The decision whether to accede to a jury's request to review testimony or exhibits in the jury

room during deliberations is generally left to the sound discretion of the trial court.").

      5.    *Hearsay objections.*

Plaintiff next argues that she is entitled to a new trial because the Court "erred in

sustaining defense counsel's objections on the basis of hearsay during plaintiff's direct

examination as to admissions made by Jon Carlson and Eric Andersen."  Pl.'s Br. in Supp. of

Mot. for New Trial at 9.  Specifically, Plaintiff contends the Court did not permit Plaintiff to

testify that Carlson told her not to mention that she had been offered a job at Ave Maria Law

School or that Andersen told Plaintiff that he "did not know" whether her politics would be held

against her.  *Id.*

While the Court initially did preclude Plaintiff from presenting such testimony as

admissions of party-opponents, *see* Oct. 15–17, 2012 Trial Tr. at 210–18, it later reversed course

and permitted Plaintiff to retake the witness stand and testify about the statements of Carlson and

Andersen.  *See id.* at 579–589.  While Plaintiff acknowledges that she was permitted to testify

about these matters, she nonetheless maintains that, because the Court "improperly interrupted"

her direct examination, it "could have resulted in the jury subsequently rejecting her testimony

when later offered into evidence."  Pl.'s Br. in Supp. of Mot. for New Trial at 9.  As Defendants

aptly point out, however, Plaintiff's belated testimony on this issue actually could have "had

even more emphasis since she presented it after the jury had heard [Andersen and Carlson]

themselves."  Defs.' Br. in Supp. of Resistance to Pl.'s Mot. for New Trial at 7.  Regardless,

even if the Court erred, it was harmless and does not support granting a new trial.

6.      *Jury instructions.*

Plaintiff finally contends that the Court erred in its Final Instructions to the jury by:  1)

failing to give Plaintiff's proposed jury instructions; 2) by giving the giving a business judgment

instruction; and 3) by refusing to provide the jury additional instruction on the meaning of

"acting under color of state law."  Pl.'s Br. in Supp. of Mot. for New Trial at 9–12.  The Court

has reviewed Plaintiff's arguments and finds them to be without merit for reasons stated at trial

and for reasons aptly stated by Defendants in their resistance brief.[22]  *See* Defs.' Br. in

Resistance to Pl.'s Mot. for New Trial at 7–11.  Moreover, the Court finds that Plaintiff

failed to explain how she was materially prejudiced by any instruction the Court gave or

declined to give.  *See Fink*, 983 F.2d at 114.  Finally, to the extent that an instruction given or

not given by the Court was error, the Court finds it was harmless and insufficient to warrant a

new trial.

### D.  *Defendants' Motion for JAML and Motion for Leave*

At the close of Plaintiff's evidence and again at the close of all the evidence in the case,

Defendants moved for judgment as a matter of law on Plaintiff's equal protection claim in Count

II, pursuant to Federal Rule of Civil Procedure 50(a).  *See* Oct. 15–17, 2012 Trial Tr. at 628–34;

Oct 17–22 Trial Tr. at 96–99.  The Court reserved ruling on the motion and permitted the equal

protection claim to go to the jury.  Oct 17–22 Trial Tr. at 98.  The jury was unable to reach a

verdict on Count II and Judge Shields declared a mistrial.  Oct. 24, 2012 Trial Tr. at 19.

Defendants now renew their motion pursuant to Federal Rule of Civil Procedure 50(b).  Defs.'

---

[22]      The Court further notes that in *Walker v. AT&T Technologies*, the Eighth Circuit found it reversible error to deny a properly made request for an instruction explaining that employers have the right to make subjective personnel decisions for any nondiscriminatory reason.  *See* 995 F.2d 846, 849 (8th Cir. 1993).

Mot. for JAML at 1–2.

Defendants raise three arguments in support of their Motion for JAML:  1) Plaintiff's equal protection claim is barred by issue preclusion, since the jury has decided that Defendants did not purposefully discriminate against her; 2) Plaintiff's equal protection claim duplicates the First Amendment claim in Count I and is, therefore barred; and 3) Defendants are entitled to qualified immunity from Plaintiff's equal protection claim as a matter of law.  Defs.' Br. in Supp. of Mot. for JAML (Clerks' No. 130-1) at 1.  Plaintiff resists all three of Defendants' arguments, asserting that issue preclusion does not bar her claim, that the equal protection claim does not duplicate the First Amendment claim in Count I, and that Defendants are not entitled to qualified immunity.  *See generally* Pl.'s Br. in Supp. of Resistance to Defs.' Mot. for JAML (Clerk's No. 132-1).  Plaintiff further contends that she adequately showed that she was treated differently than similarly-situated LAWR candidates Dawn Barker-Anderson, Lorie Reins-Schweer, and Matt Williamson, and that there was no rational basis for this differential treatment.  *Id*. at 9–15.

     1.     *Motion for leave.*

In Plaintiff's resistance, she explicitly contends, for the first time so far as the Court is aware, that her equal protection claim is a "class of one" claim.  *See id*. at 15–17 (explaining that Defendants are not entitled to qualified immunity because it is "recognized law that a class-of-one claimant may prevail" (quotations and citations omitted)).  After the time to reply had passed, Defendants filed their Motion for Leave to present the Court with additional authority on this "class of one" argument.  *See* Mot. for Leave.  In particular, Defendants sought to present the Court with additional argument regarding *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), a Supreme Court decision on "class of one" equal protection claims.  *See*

*id*.  Plaintiff resisted Defendants' request, urging that *Engquist* does not apply to this case.  Pl.'s

Resistance to Defs.' Mot. for JAML.  Plaintiff requests that the Court deny Defendants' Motion

for Leave, or alternatively, deny Defendants' Motion for JAML based on the *Engquist* decision.

*Id*.  In her brief in support of resistance, Plaintiff makes extensive argument about the

applicability of *Engquist* to her equal protection claim.  *See* Pl.'s Br. in Resistance to Defs.'

Motion for Leave (Clerk's No. 140-1).

Since it appears that Plaintiff's "class of one" argument is new and since Plaintiff has

fully responded to Defendants' assertions that a "class of one" equal protection claim is not

cognizable under *Engquist*, the Court finds it appropriate to grant Defendants' Motion for Leave.

Accordingly, the Court will consider all of the arguments presented in Defendants' additional

authority, Plaintiff's resistance to Defendants' additional authority, and Defendants' reply to

Plaintiff's resistance (Clerk's No. 141) in determining whether to grant Defendants' Motion for

JAML with respect to Plaintiff's equal protection claim.

      2.    *Defendants' Motion for JAML.*

    a. *Issue preclusion.*

Defendants first argue that the question of whether they "purposefully discriminated"

against Plaintiff based on her political beliefs was answered by the jury's verdict in favor of

Defendants on Count I, such that Plaintiff's Count II equal protection claim is now barred by

issue preclusion.  Defs.' Br. in Supp. of Mot. for JAML at 2–4.  In particular, Defendants point

out that Final Jury Instruction Number 6 (elements for a political discrimination claim) required

the jurors to determine whether "Plaintiff's political beliefs and affiliations were a motivating

factor in the Defendant[s'] decision" not to hire Plaintiff, and that Final Jury Instruction Number

8 (elements for an equal protection claim) required jurors to determine whether "Defendants purposefully discriminate against Plaintiff because of her political beliefs and affiliations." *Id*. at 3. According to Defendants, the two identified elements present the same issue (i.e., whether Defendants discriminated against Plaintiff) and the jury's findings in favor of Defendants on Final Instruction Number 6 bars Plaintiff from attempting to ask a new jury to make the "same" determination under Final Instruction Number 8. *Id*. The Court disagrees.

The doctrine of issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 128 S. Ct. 2161, 2171 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). Here, to return a verdict for Defendants on the political discrimination claim, the jury necessarily found that Plaintiff's political beliefs and affiliations were not a motivating factor in Defendants' decision not to hire her. The question on the equal protection claim is somewhat different, however. On that claim the jury could have found in favor of Plaintiff if it determined that Defendants treated Plaintiff differently than similarly situated candidates in the hiring process and that this differential treatment was due to purposeful discrimination against Plaintiff on the basis of her political beliefs and affiliations. Stated another way, the jury *could have* concluded that Plaintiff's beliefs were not a motivating decision in Defendants' ultimate decision not to hire Plaintiff, but still find that Defendants treated Plaintiff differently than other individuals in the general hiring process because of those same beliefs. Although the two issues are extremely similar, they are not identical for purposes of issue preclusion.

b. *Duplicative claims.*

Defendants next contend that Plaintiff's equal protection claim cannot survive because it duplicates the First Amendment political discrimination claim in Count I. For the same reasons discussed in § 2.D.2.a, *supra*, the Court declines to grant Defendants' Motion for JAML on this basis.

c. *Qualified immunity.*

Defendants urge that they are entitled to qualified immunity because there was no violation of Plaintiff's equal protection rights and because a reasonable person in Defendants' position would not have known she violated Plaintiff's rights to equal protection at the time the alleged violation occurred in 2007. Defs.' Br. in Supp. of Mot. for JAML at 15. In resistance, Plaintiff urges that she may proceed with her equal protection claim under a "class of one" theory by showing that she has been "intentionally treated differently from other similarly situated and that there is not rational basis for the difference in treatment." Pl.'s Br. in Resistance to Defs.' Mot. for JAML (Clerk's No. 132-1) at 15 (quotations and citations omitted). The Court must agree with Defendants.

Plaintiff is correct that class of one claims were first recognized prior to 2007.[23] *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). In *Village of Willowbrook v. Olech*, the Olechs sought to have the Village of Willowbrook (the "Village") connect their property to the municipal water supply, but were told that they would be required to grant the

---

[23] Throughout the litigation in this case, Plaintiff's equal protection theory has been unclear, at best. In her resistance to Defendants' Motion for Leave, however, Plaintiff explicitly states that she is pursuing a "class of one" equal protection claim. *See* Pl.'s Br. in Resistance to Defs.' Mot. for Leave at 2 ("The dilemma for Teresa Wagner is that her political affiliation in and by itself is not a protected class. Accordingly, her only avenue of recovery under the Equal Protection clause would be under a class of one claim.").

Village a 33 foot easement, even though other property owners were only required to grant a 15

foot easement. *Id*. at 563. The Olechs sued, claiming that the Village violated the Equal

Protection clause of the Fourteenth Amendment by imposing upon them an "irrational and

wholly arbitrary" demand for an easement that was 18 feet longer than that required of their

neighbors. *Id*. Though the district court dismissed the case, the Seventh Circuit Court of

Appeals reversed, "holding that a plaintiff can allege an equal protection violation by asserting

that state action was motivated solely by a 'spiteful effort to get him for reasons wholly unrelated

to any legitimate state objective.'" *Id*. at 564 (quoting *Olech v. Village of Willowbrook*, 160 F.3d

386, 387 (7th Cir. 1998) (other internal quotation marks and citations omitted)). On certiorari,

the Supreme Court affirmed the Seventh Circuit:

> Our cases have recognized successful equal protection claims brought by a "class of
> one," where the plaintiff alleges that she has been intentionally treated differently
> from others similarly situated and that there is no rational basis for the difference in
> treatment. *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923);
> *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cnty.*, 488 U.S. 336
> (1989). In so doing, we have explained that "'[t]he purpose of the equal protection
> clause of the Fourteenth Amendment is to secure every person within the State's
> jurisdiction against intentional and arbitrary discrimination, whether occasioned by
> express terms of a statute or by its improper execution through duly constituted
> agents.'" *Sioux City Bridge Co.*, *supra*, at 445 (quoting *Sunday Lake Iron Co. v.
> Township of Wakefield*, 247 U.S. 350, 352 (1918)).
>
> That reasoning is applicable to this case. Olech's complaint can fairly be construed
> as alleging that the Village intentionally demanded a 33-foot easement as a condition
> of connecting her property to the municipal water supply where the Village required
> only a 15-foot easement from other similarly situated property owners. *See Conley
> v. Gibson*, 355 U.S. 41, 45-46 (1957). The complaint also alleged that the Village's
> demand was "irrational and wholly arbitrary" and that the Village ultimately
> connected her property after receiving a clearly adequate 15-foot easement. These
> allegations, quite apart from the Village's subjective motivation, are sufficient to
> state a claim for relief under traditional equal protection analysis. We therefore
> affirm the judgment of the Court of Appeals, but do not reach the alternative theory
> of "subjective ill will" relied on by that court.

*Id*. at 564–65 (some internal citations omitted).

The Supreme Court revisited and limited the scope of the "class of one" theory, however, eight years later in *Engquist*, 553 U.S. at 591.  There, Anup Engquist worked as a food standard specialist for a laboratory within the Oregon Department of Agriculture ("ODA").  *Id*. at 594. Engquist had repeated problems with a coworker named Joseph Hyatt, claiming that Hyatt made false statements about her and made her life difficult.  *Id*.  When a new assistant director of the ODA, John Szczepanski, took over Engquist's lab, he told others that he could not "control" Engquist and that he would be "g[etting] rid of" her."  *Id*. at 595.  Ultimately, Szczepanski eliminated Engquist's position and Engquist sued, bringing a "class of one" equal protection claim wherein she alleged "she was fired not because she was a member of an identified class . . . but simply for 'arbitrary, vindictive, and malicious reasons.'"  *Id*.  The district court permitted Engquist's claim to proceed, but the Ninth Circuit reversed, finding that the extension of the "class of one" theory "to the public employment context would lead to undue judicial interference in state employment practices and 'completely invalidate the practice of public at-will employment.'"  *Id*. (quoting *Engquist v. Oregon Dep't of Ag.*, 478 F.3d 985, 992 (9th Cir. 2007)).

Recognizing that there "is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as a lawmaker,' and the government acting 'as proprietor, to manage its internal operations,'" the Supreme Court affirmed the Ninth Circuit.  *Id*. at 598 (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)).  The Court noted that in *Olech* and the cases on which it relied, the "significant" consideration was the "existence of a clear standard against which departures, even

for a single plaintiff, could readily be assessed," and that there was no indication in *Olech* that

the governmental entity was "exercising discretionary authority based on subjective

individualized determinations."  *Id*. at 602 ("This differential treatment raised a concern of

arbitrary classification, and we therefore required that the State provide a rational basis for it.").

The Court went on:

> There are some forms of state action, however, which by their nature involve
> discretionary decisionmaking based on a vast array of subjective, individualized
> assessments.  In such cases the rule that people should be "treated alike, under like
> circumstances and conditions" is not violated when one person is treated differently
> from others, because treating like individuals differently is an accepted consequence
> of the discretion granted.  In such situations, allowing a challenge based on the
> arbitrary singling out of a particular person would undermine the very discretion that
> such state officials are entrusted to exercise.
>
> Suppose, for example, that a traffic officer is stationed on a busy highway where
> people often drive above the speed limit, and there is no basis upon which to
> distinguish them. If the officer gives only one of those people a ticket, it may be
> good English to say that the officer has created a class of people that did not get
> speeding tickets, and a "class of one" that did.  But assuming that it is in the nature
> of the particular government activity that not all speeders can be stopped and
> ticketed, complaining that one has been singled out for no reason does not invoke the
> fear of improper government classification.  Such a complaint, rather, challenges the
> legitimacy of the underlying action itself—the decision to ticket speeders under such
> circumstances.  Of course, an allegation that speeding tickets are given out on the
> basis of race or sex would state an equal protection claim, because such
> discriminatory classifications implicate basic equal protection concerns.    But
> allowing an equal protection claim on the ground that a ticket was given to one
> person and not others, even if for no discernible or articulable reason, would be
> incompatible with the discretion inherent in the challenged action. It is no proper
> challenge to what in its nature is a subjective, individualized decision that it was
> subjective and individualized.

*Id*. at 604.  Noting that this principle "applies most clearly in the employment context," where

decisions are "often subjective and individualized, resting on a wide array of factors that are

difficult to articulate and quantify," the Court concluded that class of one equal protection claims

are "simply a poor fit in the public employment context" and that recognition of the theory in the

public employment context would "impermissibly 'constitutionalize the employee grievance.'"
*Id*. at 605, 609 (citations omitted).

While Plaintiff acknowledges *Engquist*'s general holding, she attempts to discredit its
effect on her equal protection claim by pointing to Justice Stevens' dissent, *see* Pl.'s Br. in
Resistance to Defs.' Mot. for Leave (Clerk's No. 140-1) at 1-2, which articulated numerous
reasons for disagreement with the majority's decision and concluded that "there is no compelling
reason to carve arbitrary public employment decisions out of the well-established category of
equal protection violations when the familiar rational review standard can sufficiently limit these
claims to only wholly unjustified employment actions." *Engquist*, 553 U.S. at 615–16 (Stevens,
J., dissenting).  Plaintiff contends that, in countering Justice Stevens' dissent, the majority
"denied its decision excepted state employees from the Fourteenth Amendments' protection
against unequal and irrational treatment" when the majority stated, "'[o]f course, that is not to
say that the Equal Protection Clause, like other constitutional provisions, does not apply to
public employers.'"  Pl.'s Br. in Resistance to Defs.' Mot. for Leave at 2 (citing *Engquist*, 553
U.S. at 605).  After making the referenced statement, however, the majority goes on to say:
"Indeed, our cases make clear that the Equal Protection Clause is implicated when the
government makes *class-based decisions* in the employment context, treating distinct *groups of
individuals* categorically differently." *Id*.  (citing *Engquist*, 553 U.S. at 605 (emphasis added)).
It is this need for class-based differences that is fatal to Plaintiff's claim.  While Plaintiff
contends that she was treated differently than a class of liberal counterparts, there was simply no
evidence presented at trial that would support a belief that the University of Iowa routinely or
categorically treated conservatives differently than liberals because of their political opinions.

Plaintiff's "class of one" claim presents precisely the type of discretionary public employment decision that fails under *Engquist*.[24]

## III.  CONCLUSION

For the reasons stated herein, Plaintiff's Objection (Clerk's No. 126) is DENIED; Defendants' Motion for JAML (Clerks' No. 130) is GRANTED; Defendants' Motion to Strike (Clerk's No. 131) is GRANTED; Plaintiff's Motion for New Trial (Clerk's No. 133) is DENIED; Plaintiff's Motion to Alter Judgment (Clerk's No. 135) is DENIED; and Defendants' Motion for Leave (Clerk's No. 138) is GRANTED.  The Judgment entered in favor of

---

[24]     The Court briefly notes that Plaintiff's equal protection claim is deficient on its merits, as well.  Plaintiff asserts that she was treated differently than the similarly situated Lorie Reins-Schweer, Dawn Barker-Anderson, and Matt Williamson, in that these other candidates were given several chances and provided mentoring, but Plaintiff was not.  *See* Pl.'s Br. in Supp. of Resistance to Defs.' Mot. for Leave at 3 ("In the context of this case, it was unequal and irrational treatment at the hands of the State for the University of Iowa, endorsed by Dean Jones, to treat all of the liberal candidates differently (most glaringly to mentor them) while failing to mentor or even hire plaintiff for any of these positions.").  At trial, however, Plaintiff explicitly stated that she was using only Dawn Barker-Anderson as a similarly situated comparator, not Reins-Schweer or Williamson.  *See* Oct. 15–17, 2012 Trial Tr. at 633 (The Court: "Under Equal Protection Clause, what is the—what is the evidence of similarly-situated persons that you are comparing Plaintiff?"  Mr. Fieweger:  "I am comparing her to Dawn Barker-Anderson.").

To the extent Plaintiff claims Barker-Anderson was "mentored," Plaintiff freely admits that Barker-Anderson was mentored by Todd Pettys and Caroline Sheerin, *see* Pl.'s Br. in Supp. of Resistance to Defs.' Mot. for JAML at 11, not by Dean Carolyn Jones.  Indeed, the Court is unaware of any testimony at trial that would support a conclusion that Dean Jones, the only named Defendant, was aware of any mentoring that did or did not occur, let alone that she endorsed it.  Indeed, the trial testimony supports a conclusion that it was the faculty that determined whose names would be passed along to Dean Jones for approval or rejection for hiring.  Even assuming that the faculty, in fact, declined to pass along Plaintiff's name to Dean Jones for discriminatory reasons or gave persons other than Plaintiff "second chances" for discriminatory reasons, there was insufficient evidence at trial to support a conclusion that Dean Jones was aware that discriminatory animus motivated the faculty's decision or that Dean Jones herself was motivated by a discriminatory animus in any of her own conduct.

Defendants on Count I is hereby affirmed.  The Clerk of Court shall additionally enter judgment in favor of Defendants on Count II.

IT IS SO ORDERED.

Dated this __8th__ day of March, 2013.


ROBERT W. PRATT, Judge
U.S. DISTRICT COURT